OPINION
{¶ 1} In this case, Hugh Quill, Montgomery County Treasurer, appeals from a trial court judgment approving payment to the Treasurer of the remaining balance in a receiver's account, and ordering the Treasurer to release all past due taxes and assessments on property located at 5030-5032 Prescott Avenue, Dayton, Ohio. Quill's sole assignment of error is that "[t]he lower court erred when it journalized an amended ordernunc pro tunc on April 20, 2004, ordering the Appellant, as the Treasurer of Montgomery County, Ohio, to release, as of record, all past due and unpaid real estate taxes and assessments upon the property foreclosed upon which remained on the tax records of the Appellant's office after distribution of all of the proceeds of the receivership instituted herein."
 {¶ 2} After reviewing the record and applicable law, we find the assignment of error without merit. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 3} This action began many years ago, in April, 1996, when Quill, as Montgomery County Treasurer, filed a foreclosure complaint against Troutman Enterprises, Inc. (Troutman), which owed delinquent taxes for real property located on Prescott Avenue in Montgomery County. Quill also added numerous other parties, who were said to have mortgages, tax liens, and other encumbrances on the Prescott Avenue property. In the complaint, Quill alleged that $16,963.56 in unpaid taxes, unpaid taxes, assessments, charges, and penalties were owed, and were the first and best lien against the real property. The complaint further alleged that Troutman owed another $14,281.37 for delinquent personal property taxes. Accordingly, the complaint asked for a finding that Quill had a valid first and best lien on the premises for $16,963.56. Quill also asked for a judgment of $14,281.37 on an amount owed for personal property taxes, and for the property to be foreclosed and sold.
 {¶ 4} Various defendants filed answers to the complaint. However, only Citywide Building Finance Corporation (Citywide) filed a counterclaim and cross-claim. In the counterclaim and cross-claim, Citywide asked for validation of certain certificates of judgment that it had obtained in connection with Troutman's mortgages. These liens, not including interest, amounted to nearly $27,000.
 {¶ 5} On August 5, 1996, the trial court entered a default judgment entry and decree of foreclosure. In the entry, the court found that "the master tax list of delinquent tracts which has been signed and filed includes the real estate described above; that the taxes, assessments, penalties, interest, and charge, including installments which are due and unpaid are $17,879.72; that this amount is the best and first lien on the real estate described above; that the fair market value of the said parcel as determined by the Auditor of Montgomery County is $81,000; and that Plaintiff is entitled to recover from the sale of the real estate described above at least the amount of $17,879.72, which is the lesser of the total amount of the finding and the fair market value above."
 {¶ 6} This judgment entry was signed by the attorney for Quill, and was approved by various defendants, including the United States of America, the State of Ohio, Department of Taxation and Workers' Compensation Bureau, and National City Bank. It was "seen but not approved" by the attorneys for the State of Ohio, Bureau of Employment Services and Citywide. No appeal was taken from this judgment entry. On the same day (August 5, 1996), a praecipe for order of sale was also filed, but was vacated shortly thereafter.
 {¶ 7} Subsequently, on August 22, 1996, another judgment entry and decree of foreclosure was filed. This judgment entry was based on the counterclaim and crossclaim filed by Citywide. The court found that Citywide's liens, as well as the liens of the other parties that had answered the complaint were valid. Consequently, the court stated that an order of sale would issue unless Troutman paid the amounts owed to Citywide and Quill within three days of the date of the entry. This entry was signed by the trial judge and Quill's attorney, and was approved by counsel for most of the parties who had appeared in the action. However, the entry was "seen but not approved" by the attorney for the State of Ohio, Bureau of Employment Services, and by the attorney for Heritage Mutual Insurance Co. (Heritage). No appeals were taken from this judgment entry.
 {¶ 8} A praecipe for order of sale was filed on August 27, 1996. The property was then advertised and appraised, but the sale scheduled for September 19, 1996, was cancelled. Subsequently, the property was again advertised, and was sold at sheriff's sale to Laura Fyffe on October 18, 1996, for $54,000. However, on October 25, 1996, Fyffe filed a motion to set aside the sale. In the motion, Fyffe claimed that numerous federal tax liens were attached to the property and would make title to the and would make title to the property unmarketable. Citywide opposed the motion, pointing out that the United States had the right to redeem the property for only 120 days from the sale date. According to Citywide, if the United States did not exercise its right of redemption within that time, the purchaser would own the property free and clear of the federal liens. If the United States did redeem the property, it would be obligated to pay the purchaser the purchase price plus the purchaser's interest and expenses.
 {¶ 9} On November 6, 1996, the trial court referred the matter to a magistrate, and also set a hearing date. When Fyffe did not appear for the hearing, the magistrate overruled the motion to set aside the sale. The magistrate noted that the federal tax liens were disclosed in the record and that the purchaser should have performed more investigation. When no one filed objections to the magistrate's decision, the trial court adopted the decision on January 9, 1997, and overruled the purchaser's motion to set aside the sale. No appeal was taken from this order.
 {¶ 10} Subsequently, on February 11, 1997, Citywide filed a motion to compel the purchaser to complete the sale. Alternatively, Citywide asked the court to vacate the sale and order a resale of the property. After a hearing, a magistrate granted the motion to vacate the sale, and ordered the sheriff to re-advertise the property. The magistrate also held that Fyffe would forfeit the $5,400 deposit she had paid. The sheriff was to retain those funds to pay expenses and costs, including Citywide's attorney fees. To the extent this amount was insufficient, Fyffe would be personally liable for the deficiency, as determined by further order of the court. No court. No objections were filed to this decision, and the trial court subsequently adopted the decision. Again, no appeal was taken.
 {¶ 11} After being advertised, the property was once more offered for sale at public auction on August 29, 1997. Again, no bids were received. National City Bank (NCB) then moved for appointment of a receiver. According to NCB, its mortgage embraced the rents and profits of the property. However, during the lengthy period of litigation, Troutman had continued to receive rents and profits, but had failed to pay taxes or other indebtedness on the property.
 {¶ 12} On October 9, 1997, the trial court filed an order appointing a receiver (Matthew Sorg). In the order, the court noted that despite its direction that any responsive pleadings be filed by October 6, 1997, no one had filed any pleadings in response to the motion for appointment of a receiver. The court then ordered Sorg to file accountings as provided by local court rules, and to maintain adequate insurance on the property. No appeal was taken from this order.
 {¶ 13} The property was offered for sale again on November 26, 1997, with a lower appraised value ($75,000). Once more, no bids were received. Citywide then filed a motion, asking the court to direct the minimum amount that the sheriff could accept for the property and to order another sale. In the motion, Citywide recited various amounts then due on the property, including approximately $23,659 in real estate taxes; $3,012 in court costs; $26,851, plus interest, for Citywide loans; $159,754, plus interest and penalties to the United States of America; $11,958 to Heritage Mutual Insurance; $5,478 to NCB; $57,682 to Hewitt Plumbing; and several other smaller liens.
 {¶ 14} After a hearing, the court granted the motion and ordered the sheriff to offer the property for a minimum bid of $40,000. Even at this reduced price, no one bid on the property at the public auction held on July 2, 1998.
 {¶ 15} On September 13, 1999, the receiver filed a report, indicating that it had received $7,057 in rental income. At that time, the receiver proposed distributions of $1,200 in receiver fees, and $5,185 to NCB in payment and satisfaction of its first priority indebtedness. No objections were filed to the proposed distribution. Consequently, on October 22, 1999, the court authorized the receiver to make the proposed distributions.
 {¶ 16} The receiver then filed further reports in August, 2000, August, 2001, and December, 2002, outlining various receipts and expenses. Other than receiver fees, no distributions were proposed. However, among the expenditures listed in the December, 2002 report was payment to the Montgomery County Treasurer of $3,625 in past due property taxes. After allowing time for objections (which were not filed), the court approved the reports and authorized the proposed distributions.
 {¶ 17} Following a status conference on March 25, 2003, the receiver filed a motion, asking the court for authority to sell the property. The receiver noted that he had received a purchase offer of $40,000 for the property, and that the purchaser was not a former owner or person interested in the business or operation of the receivership. Additionally, the receiver stated that "the sale of the real estate has been approved by the bankruptcy trustee and Robert Swaninger, Attorney for Montgomery County, Ohio via telephone approval."
 {¶ 18} On May 22, 2003, the trial court filed an entry granting the receiver's motion for authority to sell the real estate. The court also directed the receiver to prepare and submit a final report. Subsequently, on July 28, 2003, the receiver filed a motion to dispose of liens. In the motion, the receiver asked the court to permit him to sell the property free and clear of liens. A list of liens was attached, and included the Citywide mortgages, the Internal Revenue liens, the interest asserted by the Montgomery County Treasurer in the foreclosure action, and various other liens. On the same day, the trial court filed an entry and order allowing the sale and ordering that the property be transferred to the purchaser free and clear of all liens. No appeal was taken from this order, nor did any party ever express an objection to the proposed sale free of liens.
 {¶ 19} Subsequently, on September 25, 2003, the receiver filed its report, indicating that he had $41,101.83 in receipts, including $39,743.65 from the sale of the property. The receiver proposed distributions of $2,460 in receiver fees and $38,514.98 to the Montgomery County Treasurer for property taxes. All parties or their counsel of record were notified that any objections to the report and motion must be filed within 14 days. No objections were filed.
 {¶ 20} On October 29, 2003, the trial court set a January 23, 2004 hearing date on the receiver's motion for hearing and approval of disbursements. The receiver filed an amended report on January 8, 2004, reflecting additional receiver fees of about $300. Accordingly, the proposed distribution to the Treasurer was reduced by the same amount. As before, the parties or their counsel were notified that objections should be filed within 14 days to be timely considered. The motion also reiterated that a hearing motion also reiterated that a hearing on the proposed distribution would be held on January 23, 2004.
 {¶ 21} No objections were filed before the hearing. Consequently, the trial court filed an order on January 29, 2004, approving and authorizing the payment of the disbursements and terminating the receivership. No appeal was taken from this order.
 {¶ 22} Subsequently, the trial court filed a nunc pro tunc amended order on April 20, 2004. This order directed the receiver to pay all outstanding court costs, to pay Sorg the $2,760 receiver's fee, and to pay the balance of the receiver's account to the Montgomery County Treasurer. The court further ordered the Montgomery County Treasurer, upon receipt of the balance of the distributions, to release as of record all past due taxes and assessments on the property.
 {¶ 23} As we mentioned, the Montgomery County Treasurer (Quill), now appeals from the April 20, 2004 nunc pro tunc order, claiming that the trial court lacked authority to issue an order cancelling, abating, or releasing any delinquent or current real estate taxes. Essentially, Quill claims that liens for real estate taxes are statutorily calculated to be perpetual and cannot be removed until they are paid. Therefore, because the trial court ordered the liens removed, Quill claims that the court acted without authority.
 {¶ 24} As authority for this assertion, Quill relies on R.C. 323.11, which provides that:
 {¶ 25} "[t]he lien of the state for taxes levied for all purposes on the real and public utility tax list and duplicate for each year shall attach to all real property property subject to such taxes on the first day of January, annually, or as provided in section 5727.06 of the Revised Code, and continue until such taxes, including any penalties, interest, or other charges accruing thereon, are paid."
 {¶ 26} According to Quill, this statute deprives the court of any authority to issue orders dealing with current or delinquent real estate taxes. We disagree. In City of Cleveland v. Limbach (1988),40 Ohio St.3d 295, 533 N.E.2d 336, the Ohio Supreme Court settled a dispute between the City of Cleveland and the Tax Commissioner concerning taxes that the City wanted remitted on land it had purchased for a park. The City claimed the pertinent date was December 31 of the tax year, because that was the date after which taxes became due and were delinquent if unpaid. However, the Commissioner argued that January 1 was the appropriate date, because the real estate taxes became a lien on the property as of that date. 40 Ohio St.3d at 296.
 {¶ 27} The Ohio Supreme Court agreed with the Commissioner, explaining that "[t]axes are not required to be calculated until September in each year (R.C. 319.28), and they are not due until December 31 of that year (R.C. 323.12). Yet, under R.C. 323.11, they become a lien on the property on January 1 in each year * * *." Id.
 {¶ 28} Additionally, the court explained that "[t]hus, the lien date relates to the payment of taxes. Logically, it also relates to the remission statute that forgives the payment of taxes. There is only one tax lien date annually. It aids the county in collecting taxes, and it also controls the situation when taxes are not collected.
 {¶ 29} "Cleveland confuses delinquent taxes with unpaid taxes. All taxes are unpaid taxes until they are paid. They become a lien on January 1 regardless of whether they are calculated or due. Delinquent taxes, moreover, are unpaid taxes, but they are also taxes that have not been paid after the last day prescribed for payment of current taxes. R.C.323.01(D) and (E). Thus, delinquent taxes are unpaid taxes that have not been paid by the date due." Id. at 297.
 {¶ 30} Of interest to the present case is the fact that the court went on to consider whether the Commissioner could remit taxes that were due (as of January 1) on the property before Cleveland purchased it and used it for a park (which use would have been tax exempt). The court concluded that the Commissioner lacked jurisdiction to remit the taxes because the statute governing remission prohibited the Commission from remitting unpaid taxes that became a lien before the applicant acquired title. Id. at 296 and 297, interpreting R.C. 5713.08.
 {¶ 31} This point is significant, because the Ohio Supreme Court did not hold that R.C. 323.11 itself contained a jurisdictional barrier to remission. Instead, the court looked to another statute to see if the tax lien could be remitted. If the court believed that R.C. 323.11 absolutely barred removal of liens in perpetuity, as Quill contends, it would not have needed to consult another statute.
 {¶ 32} The question then becomes whether any particular statute prohibits the trial court in the present case from ordering the liens released. Quill does not cite a specific statute, other than R.C. 323.11, but relies on various cases that have discussed the role of liens in foreclosure or forfeiture cases. However, while this case began as a foreclosure proceeding under R.C. 5721.18, the property was not sold at public auction pursuant to R.C. Chap. 5721. Instead the court-appointed receiver sold the property. receiver sold the property.
 {¶ 33} The trial court properly appointed a receiver under R.C. 2735.01, based on the fact that Troutman was improperly retaining rental proceeds. Where a receiver is appointed, R.C. 2735.04 provides that "[u]nder the control of the court which appointed him, as provided in section 2735.01 of the Revised Code, a receiver may bring and defend actions in his own name as receiver, take and keep possession of property, receive rents, collect, compound for, and compromise demands, make transfers, and generally do such acts respecting the property as the court authorizes."
 {¶ 34} R.C. Chap. 2735 does not contain any restrictions on what the court may authorize when it issues orders regarding receivership property. Ironically, Quill concedes that the trial court's nunc pro tunc
order would have been perfectly appropriate if the Treasurer had sold the foreclosed property instead of the receiver. In this regard, Quill focuses on the fact that R.C. 5721.19(E) gives a county treasurer authority to have taxes and assessments deemed satisfied if a delinquent tax sale results in a deficiency. However, because the property was instead sold by the receiver, Quill contends that the court had no authority to order the release of liens. We disagree.
 {¶ 35} Quill's action was brought under R.C. 5721.18, which provides for foreclosure proceedings in the name of the county treasurer to foreclose the state's lien for delinquent taxes. Under R.C. 5721.19(E), if the proceeds from the sale of the parcel are insufficient to pay the taxes, assessments, interest, penalties, and other costs, the court may enter a deficiency judgment against the owner. However, the court also has However, the court also has authority not to enter a deficiency judgment against the owner. In that event, R.C. 5721.19(E) provides that "the taxes, assessments, charges, penalties, interest, and costs shall be deemed satisfied." Further, R.C. 5721.19(F)(2) states that upon confirmation of the sale, "the title to such land or lots shall be incontestable in the purchaser and shall be free and clear of all liens and encumbrances * * *."
 {¶ 36} Nothing in these sections limits the authority of the court, just as nothing in R.C. Chap. 2735 limits the court's authority when a receiver is appointed. As we noted, Quill concedes that the trial court's order would have been proper if the Treasurer had sold the property (or more correctly, if the sheriff had sold the property for the Treasurer). However, attempts to sell the property via that route were unsuccessful, so the receiver and court chose an alternative that would allow the Treasurer to recover most of the tax money that was due. Quill was a party to the action, was notified of all actions of the court and receiver, and acquiesced to all pertinent matters. At no time did Quill object to what the receiver and court proposed to do. As a result, Quill cannot now challenge what he either agreed to or failed to contest in the trial court.
 {¶ 37} In Grafton v. Mong (1938), 134 Ohio St. 416, 17 N.E.2d 649, the Ohio Supreme Court held that "[a]n order to a sheriff to pay taxes, which were then a lien on real estate, out of the proceeds of a judicial sale of such real estate, under Section 5692, General Code, does not operate to transfer the tax lien from the real estate to the proceeds of sale, and when the sheriff fails to pay the taxes as directed, an action in injunction will not lie against the county auditor and treasurer to prevent them from to prevent them from carrying such taxes on the duplicate and from collecting them, where it does not appear they wereparties to the proceedings resulting in the sale of the real estate, ordid anything else which might be urged against them by way of estoppel." Id. at syllabus (emphasis added).
 {¶ 38} In Grafton, the plaintiff purchased property at a foreclosure sale and paid the sheriff the sale price. By court order, the sheriff was supposed to withhold enough from the sale proceeds to pay the taxes. When the sheriff failed to pay, the county auditor placed the amount due on the tax duplicate and certified it to the county treasurer for collection. The plaintiff then brought a petition against the treasurer and auditor, asking that they be enjoined from carrying the amount on the tax duplicate and from attempting to collect the tax. However, the trial court dismissed the petition. 134 Ohio St. at 416-17. On appeal, the Ninth District Court of Appeals focused on the fact that no public official with authority for enforcement and collection of taxes had been made a party to the suit. Consequently, the court held that the public's right to enforce the lien could not be affected. Grafton v. Mung (1938),60 Ohio App. 228, 232, 20 N.E.2d 722, affirmed, 134 Ohio St. 416,17 N.E.2d 647.
 {¶ 39} On further appeal, the Ohio Supreme Court agreed, stating that it was difficult to see how the treasurer and auditor could be made to respond to a suit for injunction when they were not "parties to the proceeding resulting in the sale of the real estate, with an opportunity to assert the lien for taxes, * * * [nor] took any other action upon which an injunction suit against them might be grounded."134 Ohio St. at 419. Therefore, the court affirmed the dismissal of the injunction action. Id.
 {¶ 40} In Grafton, the Ohio Supreme Court clearly recognized in its syllabus that estoppel can apply to public entities responsible for collecting taxes and enforcing liens. See also, Bernhard v. O'Brien
(1953), 97 Ohio App. 359, 372, 126 N.E.2d 349, (stressing thatGrafton "lends no support to the thesis that a purchaser at a judicial sale takes his title subject to all unpaid taxes and assessments in an action to which the county auditor and county treasurer are parties, duly served with summons and notified of the steps in the proceedings leading up to the sale"). 97 Ohio App. At 372. Notably, there was no need to apply estoppel in Grafton, since the auditor and treasurer had not been named as parties in the foreclosure action.
 {¶ 41} In contrast, the Treasurer initiated the present action, and was properly notified of all pertinent proposed actions, including the appointment of a receiver, the proposed sale of the property after several fruitless attempts to sell at a public sale, and the fact that the property would be transferred to the purchaser free of the tax liens. At no time did Quill object. In fact, Quill's attorney specifically approved the sale. Under the circumstances, Quill is estopped from contesting the extinguishment of its liens.
 {¶ 42} "[E]quitable estoppel precludes a party from asserting certain facts when that party, by his conduct, has induced another to change his position in good faith reliance on that conduct. * * *" Shapely, Inc. v.City of Norwood Earnings Tax Bd. of Appeals (1984), 20 Ohio App.3d 164,165, 485 N.E.2d 273, citing State, ex rel. Cities Service Oil Co., v.Orteca (1980), 63 Ohio St.2d 295, 299, 409 N.E.2d 1018 (applying estoppel to municipal corporation). The purchaser in this case clearly changed his or her position, by paying a substantial sum for property that was supposed to be was supposed to be transferred free and clear of the liens.
 {¶ 43} As an additional point, we note that appellate arguments are waived where parties could have alerted the trial court to potential error, but failed to do so. See, e.g., State v. Childs (1968),14 Ohio St.2d 56, 236 N.E.2d 545, at paragraph three of the syllabus, andBank One Dayton, N.S. v. Ellington (1995), 105 Ohio App.3d 13, 17,663 N.E.2d 660. We have discretion to consider plain error, but we do so only "`with the utmost caution, under exceptional circumstances, and to prevent a manifest miscarriage of justice.'" Stiver v. Miami Valley CableCouncil (1995), 105 Ohio App.3d 313, 318, 663 N.E.2d 1310.
 {¶ 44} We are not likely to find exceptional circumstances where a party expresses agreement with a course of action, raises no timely objection to the outcome of that course of action in the trial court, and then takes a contrary position on appeal. Accordingly, we find that Quill has waived any objection to the proposed distribution, and that he is also estopped from claiming any tax liens on the property.
 {¶ 45} We should note that we are aware of Quill's argument that tax liens continue by statute and cannot be extinguished other than by full payment or until they are extinguished by forfeiture or foreclosure. However, we disagree that forfeiture or foreclosure are the only means of extinguishing a lien. If this were the case, the Ohio Supreme Court would not have commented on estoppel as it did in Grafton. Furthermore, nothing in the cases cited by Quill precludes either a finding of estoppel or that a party has waived arguments by failing to make them in the trial court.
 {¶ 46} For example, while discussing tax liens, the court in Mariniv. Roach (1976), 54 Ohio App. 2d 114, 375 N.E.2d 808, noted that while courts are "unqualifiedly permitted `to order the payment of existing taxes on real estate out of the proceeds realized on the judicial sale thereof * * *' * * *, it does not follow that `a tax lien on the property is automatically transferred to the proceeds of sale.'"54 Ohio App.2d at 116, quoting from Grafton, 134 Ohio St. at 418. We agree with this statement. However, the application of estoppel is not precluded by the fact that liens are not automatically transferred to the proceeds of sale. It is also not precluded by the fact that tax liens arise each year on January 1 by operation of law.
 {¶ 47} In arguing for reversal, Quill notes that no one objected to the amount of the tax liens in the trial court. According to Quill, the trial court, therefore, was required to ensure that outstanding taxes either were paid or were passed to the receiver's buyer. Quill also focuses on alleged assumptions one would make when reading the language of the receiver's motion to dispose of liens and the court entry ordering the sale of real estate. Specifically, Quill claims that someone reading these documents would assume that the sale would satisfy the real estate tax, since the parcel previously sold in 1996 for $54,000. We disagree that this is a reasonable assumption.
 {¶ 48} The property admittedly sold for $54,000 in 1996. However, the sale was vacated because the buyer refused to proceed, claiming that the property was unmarketable due to the large amount of federal tax liens. Thereafter, three more public sales failed, with no bids, even when the minimum bid was reduced to $40,000. $40,000. On May 20, 2003, the receiver filed a motion asking the court for authority to sell the property. In the motion, Quill was notified that the receiver had a buyer for a sale price of $40,000. The motion even specially stated that Quill's attorney had approved the sale. Shortly thereafter, the receiver filed a motion to dispose of the pending liens, including the liens asserted by Quill.
 {¶ 49} Under the circumstances, it is inconceivable that anyone would assume that the property would sell for $54,000 and that the sales price would satisfy the outstanding tax liens. In fact, Quill was explicitly informed that the property would sell for a much lower amount. In our opinion, Quill was fortunate to receive more than $38,000 in payment of the tax liens, particularly since the remaining lienholders were paid nothing.
 {¶ 50} As a final matter, we note that Quill claims certain issues are still pending in the trial court, such as court costs and a deposit filed with the clerk for a bond. If this is true, the trial court or clerk can address these issues at the conclusion of this appeal. The trial court could also have dealt with such matters during the appeal. Admittedly, the order confirming the sale and discharging the receiver was a final appealable order. See, e.g., Mandalaywala v. Zaleski (1997),124 Ohio App.3d 321, 329-31 (an order confirming a sale by a receiver affects substantial rights in a special proceeding and is a final, appealable order). However, even while cases are pending on appeal, trial courts retain all jurisdiction "that is not inconsistent with the court of appeals' jurisdiction to reverse, modify, or affirm the judgment."Ferraro v. B.F. Goodrich Co., 149 Ohio App.3d 301, 2002-Ohio-4398,777 N.E.2d 282, at ¶ 10. As a result, if Quill felt the costs and bond should be addressed, he could have filed a motion with the trial court during should be addressed, he could have filed a motion with the trial court during the appeal. Consequently, we attach no importance to the fact that court costs may be pending. We also observe that the order being appealed was the subject of a Civ. R. 54(B) certification, which implies that claims may still be pending.
 {¶ 51} Based on the preceding discussion, the single assignment or error is without merit and is overruled. Accordingly, the judgment of the trial court is affirmed.
Wolff, J., and Grady, J., concur.